UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONELLE WILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-01295 |
| | ) | |
| v. | ) | Judge John Robert Blakey |
| | ) | |
| THOMAS DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Donelle Willis sues under 42 U.S.C. § 1983 alleging that three individual correctional officers (Officer Cribbs, star #15739; Lt. Rodriguez, star #752; and Sgt. Garcia, star #3310) each failed to protect him from injury (counts I through III, respectively). Plaintiff also asserts a *Monell* claim (count IV) against Cook County and its Sheriff, Thomas Dart. Defendants move to dismiss the operative complaint in full. *See* [30]. For the reasons explained below, this Court declines to dismiss the claims against the individual officers but grants the motion to dismiss the *Monell* claim.

I.  **Background**[1]

Plaintiff, an inmate at Cook County Jail (CCJ) during the relevant time, suffers from bipolar disorder; as a result, CCJ classified him as a "P3" inmate requiring "special monitoring by the medical and correctional staff." [24] ¶¶ 8–9. To provide the special oversight, CCJ placed Plaintiff in Tier 4G, a Residential

---

[1] This Court takes these alleged facts from Plaintiff's amended complaint [24].

1

Treatment Unit (RTU) designated for detainees with mental illness who need increased care and supervision. *Id.* ¶¶ 8, 24–27. P3 inmates in Tier 4G live in a "dorm" setting rather than in individual cells. *Id.* ¶¶ 10–11, 36

On September 15, 2020, CCJ moved another detainee, Marshawn Fulton, to Tier 4G after Fulton was accused of violently attacking another detainee on Tier 3D. *Id.* ¶ 24. Sgt. Garcia, the tier supervisor, and Lt. Rodriguez, who served as the watch commander, approved Fulton's transfer to Tier 4G. *Id.* ¶¶ 36, 48. Correctional Officer Cribbs, the tier officer on duty at the time, escorted Fulton to Tier 4G and then "closed the door and did not bother to enter the tier." *Id.* ¶¶ 21–22, 25. After Fulton entered the tier, he walked to Plaintiff's bed and punched Plaintiff in the face, breaking his jaw. *Id.* ¶¶ 27, 30.

Plaintiff claims that all Defendants knew of Fulton's history of violence and aggressive behavior. *Id.* ¶¶ 15, 29, 35, 46, 66. Plaintiff further claims that all Defendants knew that P3 detainees face a heightened risk of harm that necessitates increased care, supervision, and security checks. *Id.* ¶¶ 18, 23, 37, 46–49, 72. Despite the knowledge of heightened danger, Plaintiff alleges, Defendant Dart has "a widespread practice to continue to house an inmate in the same dorm or to transfer the inmate to another 'P3' dorm when there is knowledge an inmate serially attacks staff or inmates," rather than isolating violent P3 inmates in single cells. *Id.* ¶¶ 10–11. Plaintiff alleges that, although CCJ policy requires officers to maintain twenty-four-hour direct supervision over P3 inmates and to conduct "security checks" every fifteen minutes, as Defendant Dart knows, officers do not follow the policy. *Id.* ¶¶

18–20. Plaintiff alleges that, between January 1, 2020 and January 30, 2020, there were over fifty instances of serious injury to inmates due to an officer leaving his or her post in the RTU dorm. *Id.* ¶ 60.

Plaintiff alleges that: Defendant Cribbs violated Plaintiff's Fourteenth Amendment rights when he elected not to enter Tier 4G with Fulton, despite knowledge of Fulton's violent tendencies; Defendant Rodriguez violated Plaintiff's rights when he approved Fulton's transfer to Plaintiff's tier, knowing the transfer created an unreasonable risk of harm to Plaintiff; Defendant Garcia violated Plaintiff's rights when he failed to isolate Fulton, exposing Plaintiff to an unreasonable risk of harm; and Sheriff Dart violated Plaintiff's rights by failing to implement policies to protect P3 inmates and by allowing a systemic failure to follow safety protocols. *See* [24]. Plaintiff sues Cook County as an indispensable party to cover any damages awarded against Defendant Dart. *Id.*

Defendants move to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) [30].

## II.  Legal Standard

To survive a 12(b)(6) motion, a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so that the Defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief, allowing this Court to "draw the reasonable

3

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Id.* at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action" and mere conclusory statements "do not suffice." *Id.*

When evaluating complaints under Rule 12(b)(6), courts accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.* Courts "must also consider 'documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.'" *Jafri v. Chandler LLC*, 970 F. Supp. 2d 852, 855 (N.D. Ill. 2013) (quoting *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

### III. Analysis

#### A. Claims Against the Defendant Officers

Plaintiff alleges that Defendant Cribbs, as the "tier officer" for 4G in the RTU on September 15, 2020 (the night Fulton attacked Plaintiff), was charged with "direct supervision" of the tier and knew that leaving the tier without relief would expose all inmates to an unreasonable risk of harm. [24] ¶¶ 4, 22–23. Nevertheless, after opening the door to allow Fulton to enter the tier and directing Fulton to a bed at the front of the dorm, Cribbs closed the door without entering the tier. *Id.* ¶ 25. Cribbs' conduct was especially egregious because Cribbs knew Fulton had violently attacked another inmate only a few hours earlier. *Id.* ¶ 24. Plaintiff alleges that he would not

have been harmed if Cribbs has taken reasonable measures on September 15, 2020 to provide security to inmates on the tier. *Id.* ¶ 31.

As to Defendants Rodriguez and Garcia, Plaintiff alleges that, at the time of the incident, Defendant Rodriguez was the watch commander for the RTU and Defendant Garcia was the sergeant assigned to supervise Tier 4G in the RTU. [24] ¶¶ 32, 44. Plaintiff alleges that Rodriguez learned, about three hours before the transfer, that Fulton had attacked another inmate, knew Fulton had a pattern of attacking inmates and staff, and knew Fulton was "particularly dangerous because of his mental illness." *Id.* ¶¶ 33–35. Plaintiff alleges that Defendant Garcia knew Fulton was being transferred into Tier 4G after attacking another inmate, knew that Fulton was classified as P3 and had a history of serially attacking inmates and staff, and knew that P3 inmates were "particularly vulnerable and required a high level of supervision by the security staff." *Id.* ¶¶ 45–47. Plaintiff alleges that Defendants Rodriguez and Garcia had the power to isolate Fulton and instead approved Fulton's transfer to Tier 4G, knowing the risk he posed. *Id.* ¶¶ 36, 38, 50.

Defendants Cribbs, Rodriguez, and Garcia move to dismiss, arguing that Plaintiff's allegations fail to state a failure to protect claim. The Court finds otherwise.

Because Plaintiff is a pretrial detainee, his claim falls under the Fourteenth Amendment. *See, e.g., Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) ("The Eighth Amendment's prohibition on cruel and unusual punishment gives rise to the constitutional rights of a convicted state prisoner. A pretrial detainee's constitutional

rights are distinct from a prisoner's rights because the State cannot punish a pretrial detainee. Thus, the source of the pretrial detainee's rights is the Fourteenth Amendment's Due Process Clause") (quoting *Est. of Cole by Pardue v. Fromm*, 94 F.3d 254, 259 n.1 (7th Cir. 1996)). As a result, the deliberate indifference standard no longer applies, *see Kingsley v. Hendrickson*, 576 U.S. 389 (2015), and, to win on his failure to protect claim, Plaintiff must show only that: (1) he faced objectively serious conditions, meaning a substantial risk of serious harm; (2) the defendants acted purposefully, knowingly, or recklessly with respect to the consequences of their actions; and (3) the defendants' actions were objectively unreasonable, *Hardeman v. Curran*, 933 F.3d 816, 827 (7th Cir. 2019) (Sykes, J., concurring); *Jones v. Williams*, No. 18-CV-03686, 2021 WL 3408508, at *11 (N.D. Ill. Aug. 4, 2021). *See also Dawson v. Dart*, No. 17-CV-00283, 2020 WL 1182659, at *2 (N.D. Ill. Mar. 12, 2020), ("the elements of a failure to protect claim under *Kingsley*'s objective standard include that: (1) defendant acted purposefully, knowingly, or recklessly with respect to a risk of harm; and (2) defendant's conduct was unreasonable given the totality of the circumstances.") (citing *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018); *Miranda v. Cnty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc)). Whereas the Eighth Amendment deliberate indifference standard "requires a showing that the defendant had a "sufficiently culpable state of mind" and asks whether the official actually believed there was a significant risk of harm," under the Fourteenth Amendment, a pretrial detainee need not prove subjective awareness on the part of the defendant but only

6

that the defendant's conduct was objectively unreasonable. *Miranda*, 900 F.3d at 350–51. Objective reasonableness (or unreasonableness) "turns on the facts and circumstances of each particular case," viewed "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397 (quotations omitted). Additionally, the subjective component requires a pretrial detainee plaintiff to "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Castro*, 833 F.3d at 1071 (cited in *Hardeman*, 933 F.3d at 823).

As noted in *Jones*, "the line between a failure to act that is purposeful, knowing, or reckless (on the one hand) and deliberate indifference (on the other) is not the brightest," 2021 WL 3408508, at *14 n.9. But, as a practical matter in this case, Plaintiff's complaint, which alleges Defendants' knowledge and notice that Fulton posed a risk, suffices to advance the case. *See Young v. Dart*, No. 17-CV-1914, 2021 WL 3633927, at *11 (N.D. Ill. Aug. 17, 2021) ("a correctional officer is not liable on a failure-to-protect claim unless the officer knew or had good reason to know about the substantial risk of serious harm."). Plaintiff's allegations demonstrate that he faced objectively serious conditions and a substantial risk of serious harm. As the Seventh Circuit noted in *Brown v. Budz*, "a beating suffered at the hands of a fellow detainee . . . clearly constitutes serious harm, as '[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" 398 F.3d 904, 910–11 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The question is whether the risk of that beating was substantial.

*Brown*, 398 F.3d at 911. The *Brown* Court noted that successful failure-to-protect cases generally involve "risks attributable to detainees with known 'propensities' of violence toward a particular individual or class of individuals; to 'highly probable' attacks; and to particular detainees who pose a 'heightened risk of assault' to the plaintiff." *Brown*, 398 F.3d at 911. In other words, "substantial risk" means "risks so great that they are almost certain to materialize if nothing is done." *Id.* (quoting *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 259 (2009)).

> In *Dale v. Poston*, the court vividly illuminated the legal standard as follows:
>
> picture an inmate with a cobra in his cell. If the prison officials "know that there is a cobra there or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference." The precise identity of the threat, be it a cobra or a fellow inmate, is irrelevant. A prison official "cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault." On the other hand, as the vagueness of a threat increases, the likelihood of "actual knowledge of impending harm" decreases. So, too, does the official's ability to respond. The ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances.

548 F.3d 563, 569 (7th Cir. 2008) (quoting *Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995), and *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001), and citing *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005)). Dale, an informant who had cooperated against several inmates serving time in the same prison, was attacked and stabbed seven times by another inmate; he sued, alleging that prison

8

officials failed to protect him from the attack.[2] *Id.* The court noted that prisons are "dangerous places often full of people who have demonstrated aggression," thus not every inmate attack violates the Eighth Amendment; a constitutional violation occurs only when "the official knows of and disregards an excessive risk to inmate health or safety." *Id.* (citing *Farmer*, 511 U.S. at 837). The court held that Dale's attacker *was* a cobra, but the defendants did not know it: because Dale's statements expressing concern were so vague, "for all they knew, Dale was being harassed by a garter snake. Irritating, yes. Deadly, no." *Id.* The court rejected the notion that an officer violates the constitution anytime an inmate branded a "snitch" gets attacked; after recognizing that informants "face unique risks in prison," the court nonetheless held that "each case must be examined individually, with particular focus on what the officer knew and how he responded." *Dale*, 548 F.3d at 570. Because the defendants did not know "there was a true threat at play," the court affirmed the entry of summary judgment in the defendants' favor. *Id.*

Here, Plaintiff alleges that Defendants knew Fulton was a "cobra" who posed a real threat based on a series of alleged incidents involving Fulton: on July 10, 2019, Fulton fought with other inmates; on July 13, 2019 Fulton threatened correctional and mental health staff after being transferred for threatening behavior; on August 8, 2019, Fulton fought another inmate; on August 10, 2019 Fulton threatened an

---

[2] Although Dale, a convicted prisoner in state custody, sued under the Eighth Amendment, post-*Kingsley*, a pretrial detainee's constitutional claim "still carries a subjective component" and the inmate must still "show that he is incarcerated under conditions posing a substantial risk of serious harm" because "only 'objectively [and] sufficiently serious' deprivations are actionable as a violation of the Constitution." *Hardeman*, 933 F.3d at 826–27 (Sykes, J., concurring) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

9

inmate and disobeyed direct orders of correctional staff; on August 11, 2019 Fulton bullied inmates; on August 21, 2019 Fulton threatened inmates and disobeyed orders; on August 22, 2019 Fulton struck an officer and threatened to kill the staff; on August 9, 2020, Fulton led a detainee rebellion and shouted profanities directed toward staff; on August 14, 2019 Fulton struck an inmate without provocation; on August 31, 2019 Fulton, unprovoked, threw a detainee to the ground; and on September 15, 2019, Fulton threw "close hand strikes" at another inmate. [24] ¶ 15.[3] This last incident led to Fulton's transfer to Tier 4G, where he then attacked Plaintiff. *Id.* Although these allegations fail to include any facts or details about Fulton's prior victims, their injuries, or the exact nature of the attacks, Plaintiff alleges that several of the incidents involved violent physical assaults on other inmates, and he alleges that at least two of the attacks were unprovoked. *Id.* ¶ 15. Significantly, the three incidents immediately preceding the attack on Plaintiff all involved physical attacks. *Id.* More to the point, Plaintiff alleges that Defendant Cribbs knew that Fulton was being transferred to Tier 4G because he had just attacked another inmate, and "knew that placing Fulton in the tier exposed other inmates to attack because of his propensity to attack staff and inmates without provocation." *Id.* at ¶ 24. He alleges that Defendant Rodriguez knew Fulton had a recent "pattern of attacking inmates and staff" and knew Fulton had been "involved in several different incidents involving violence at Cook County Jail." *Id.* at ¶ 34. And he alleges that Defendant Garcia

---

[3] Plaintiff also alleges that Fulton engaged in two violent acts *after* he attacked Plaintiff. [24] ¶ 15. But these subsequent attacks are not material to any notice or knowledge Defendants may have had prior to the attack on Plaintiff.

10

knew Fulton "had a history of serially attacking inmates and staff at Cook County Jail" "because it was documented in the Cook County Jail's C-COMS system available to all sworn staff." *Id.* at ¶ 46.

Ultimately, Plaintiff's case here may go the same way as *Dale*; Plaintiff's claim, like Dale's, urges liability in part because the attack involved a particularly vulnerable inmate (a P3 inmate housed in the RTU here, an informant in *Dale*). But *Dale* was decided on a full record. And, at this stage, Plaintiff's allegations suffice to show that Fulton's track record established a sufficient risk of an attack. Plaintiff alleges, in effect, that Fulton was a cobra, that Defendants Cribbs, Garcia, and Rodriguez knew he was a cobra, and that they nonetheless allowed him free rein in the open tier, in violation of both reasonable practices and CCJ's own policies. As such, Plaintiff has alleged that Defendants' conduct was objectively unreasonable, not merely negligent. Accordingly, the Court denies the motion to dismiss as to counts I, II, and III.

    **B.**    **Plaintiff's *Monell* Claim**

In count IV, Plaintiff brings a *Monell* claim against Sheriff Dart and Cook County. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Plaintiff alleges that there exists a widespread practice in P3 dorms in the RTU for correctional officers to sit in the hallway out of sight and hearing of the detainees, which results in "grossly inadequate security" for P3 detainees. [24] ¶¶ 56–58, 61–63. Plaintiff also alleges that CCJ failed to implement a policy of removing violent P3 inmates from

11

dorms and placing them in single cells and failed to train correctional staff at CCJ about how to house serially violent P3 detainees in the RTU. *Id.* ¶¶ 65, 69.

Under *Monell*, Defendants may be liable for any deprivation of Plaintiff's constitutional rights only if they caused the deprivation. 436 U.S. at 691–92. As the Seventh Circuit recently observed, liability under *Monell* remains "difficult to establish precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct. A primary guardrail is the threshold requirement of a plaintiff showing that a municipal policy or custom caused the constitutional injury." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377 (7th Cir. 2020), *cert. denied sub nom. Polk Cnty., Wis. v. J.K. J.*, 141 S. Ct. 1125 (2021) (citing *Monell*, 436 U.S. at 690–91).

The "critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017). Such "action" may be "an express policy (embodied, for example, in a policy statement, regulation, or decision officially adopted by municipal decisionmakers), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality." *J.K.J.*, 960 F.3d at 377 (citing *Glisson*, 849 F.3d at 379). In addition to alleging municipal action, Plaintiff "must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged"—that is, Plaintiff must "show that the municipal action was taken with the requisite degree of culpability and must demonstrate a

12

direct causal link between the municipal action and the deprivation of federal rights." *J.K.J.*, 960 F.3d at 377 (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997); and citing *Monell*, 436 U.S. at 694).

Where, as here, a *Monell* claim is predicated at least in part on inaction, the "path" to liability is "steeper," *J.K.J.*, 960 F.3d at 378, but not insurmountable: A County's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [County] itself to violate the Constitution.'" *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011); and citing *Glisson*, 849 F.3d at 382).

Moreover, "identifying municipal action—or, as it were, inaction—is only part of the requisite inquiry under *Monell*. The Supreme Court has made plain that a failure to act amounts to municipal action for *Monell* purposes only if the County has notice that its program will cause constitutional violations." *J.K.J.*, 960 F.3d at 379 (citing *Connick*, 563 U.S. at 61–62). Sometimes the notice will come from "a pattern of past similar violations; other times it will come from evidence of a risk so obvious that it compels municipal action. But at all times and in all *Monell* cases based on this theory, the Supreme Court has directed the focus on the presence and proof of 'a known or obvious' risk." *J.K.J.*, 960 F.3d at 381.

To the extent Plaintiff seeks to impose *Monell* liability for Defendant Cribbs' failure to provide "strict supervision," his claim fails. As Judge Easterbrook noted in his dissent in *J.K.J.*, "subordinate employees' failure to comply with a valid policy is not a ground of liability against a municipality." 960 F.3d at 387.

Plaintiff also alleges that the County failed to enact a policy to segregate mentally-ill offenders who are known to be violent, allowing them instead to move freely in open dorm tiers. And he alleges that the Sheriff and County knew serially violent "P3" inmates who are transferred into other dorms frequently attack staff and inmates when reassigned to another dorm. [24] at ¶ 71. To this extent, he may state a valid *Monell* claim, as housing violent, unstable inmates in an open floor dorm without direct supervision would seem to pose an obvious risk. And Plaintiff alleges that this policy (or lack of policy) directly caused his injury.

Nevertheless, Plaintiff's claim on this score, as pled, fails, because he does not allege facts to suggest that CCJ had a custom or practice of transferring serially violent P3 inmates to other open RTU tiers. He alleges facts as to Fulton only. And that is not enough. *See, e.g., Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (holding that to impose liability under *Monell* based upon a widespread custom or practice, a plaintiff must allege that such conduct occurred more than once, or even three times; plaintiff must allege facts to show that there is a policy at issue, rather than a random event).

Plaintiff's *Monell* claim against Cook County fails for the additional reason that the Sheriff, not the County, is the policymaker at CCJ. *E.g., Thompson v. Duke*, 882 F.2d 1180, 1187 (7th Cir. 1989) (CCJ is "solely under the supervision and control of the Sheriff of Cook County"; thus plaintiff cannot sue Cook County under *Monell* for "practices, policies, or actions" unrelated to that entity).[4]

---

[4] If Plaintiff were to state a *Monell* claim against Dart, Cook County would remain in the case as an indispensable party. *See Hunt v. Dart*, No. 07 C 6003, 2010 WL 300397, at *2 (N.D. Ill. Jan. 22, 2010)

14

For these reasons, the Court grants the motion to dismiss count IV.

## IV.     Conclusion

For the reasons explained above, this Court grants in part and denies in part Defendants' motion to dismiss [30]. The Court denies the motion as to the claims against the individual officers (counts I, II, and III), but grants the motion as to Plaintiff's *Monell* claim (count IV). The dismissal of count IV is without prejudice, however, and if Plaintiff can allege facts to cure the deficiencies discussed above, he may do so by April 15, 2022.

The parties shall file a joint, updated status report by April 22, 2022, proposing a reasonable schedule for any remaining fact discovery, indicating whether the parties require expert discovery, and indicating whether either party plans to seek summary judgment. If the parties agree that a settlement conference with the assigned Magistrate Judge could be productive, they should call chambers to so advise, and the Court will enter an appropriate referral order. The Court encourages the parties to exhaust the possibility of settlement before spending time and money on expert discovery and dispositive motions.

Dated:  March 14, 2022             Entered:

_____
John Robert Blakey
United States District Judge

---

("a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer) (citing *Carver v. Sheriff of LaSalle County*, 324 F.3d 947, 948 (7th Cir. 2009)).