**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DONELLE WILLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 21 CV 01295** |
| | ) | |
| **v.** | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **CHRISTOPHER CRIBBS,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Donelle Willis brings this action under 42 U.S.C. §1983 against defendant Cook County Sheriff's Office correctional officer Christopher Cribbs, claiming that Cribbs violated his Fourteenth Amendment rights by failing to protect him at Cook County Jail from another inmate whom they knew posed a risk of imminent harm to others. Specifically, Willis alleges that this dangerous inmate was transferred into his dormitory tier in the middle of the night, after that inmate told Cribbs on multiple occasions that he would attack inmates in that tier, without entering the tier to supervise and protect Willis from that inmate. The inmate promptly attacked Willis, who was sleeping, repeatedly punched him, and seriously injured him by breaking his jaw.

Before the Court is Cribbs' motion for summary judgment, in which Cribbs asserts that he is entitled to summary judgment because: (1) plaintiff cannot prevail on his Section 1983 failure to protect claim; and (2) even if he could, Cribbs is entitled to qualified immunity. (Dckt. ##130, 131). Plaintiff opposes Cribbs' motion, arguing that genuine questions of material fact preclude summary judgment on his Section 1983 claim and that Cribbs is not, in any event,

entitled to qualified immunity. (Dckt. #140). The Court agrees with Willis, and denies Cribbs' motion.

## I. PROCEDURAL BACKGROUND

On March 8, 2021, Willis filed this lawsuit against Thomas Dart, the Sheriff of Cook County, and Cook County Sheriff's Office correctional cfficer Christopher Cribbs, asserting a failure to protect claim against Cribbs and a *Monell* claim against Dart and Cook County. (Dckt. #1). On June 4, 2021, Willis filed an amended complaint adding claims pursuant to Section 1983 against correctional officers Lieutenant Rodriguez and Sergeant Garcia. (Dckt. #24). On June 28, 2021, all defendants moved to dismiss, (Dckt. #30), and on March 14, 2022, this Court granted defendants' motion to dismiss plaintiff's *Monell* claim, but denied the motion to dismiss as to plaintiff's claims against the individual officers, (Dckt. #35). On April 29, 2022, defendants answered plaintiff's amended complaint, (Dckt. ##40–44), and the parties proceeded through discovery.

On August 4, 2023, the individual officers moved for summary judgment, arguing that Willis had failed to exhaust his administrative remedies before filing this lawsuit as required by the Prison Litigation Reform Act. (Dckt. #91). This Court denied the motion for summary judgment as to defendant Cribbs, but granted the motion as to defendants Garcia and Rodriguez, dismissing the claims against them without prejudice. (Dckt. #112). On January 21, 2025, defendant Cribbs filed the instant motion for summary judgment, asserting that Willis cannot prevail on his Section 1983 claim or, in the alternative, that Cribbs is entitled to qualified immunity. (Dckt. ##130, 131).

## II. LEGAL STANDARD

### A. Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Pfalzgraf v. Rusk Cnty., Wis.*, 187 F.4th 507, 512 (7th Cir. 2026). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact).

When the moving party has met its burden, the non-moving party cannot rely on "conjecture and conclusions" to concoct factual issues. *Johnson v. Ridge Tool Mfg. Co., Inc.*, 186 F.4th 478, 489 (7th Cir. 2026). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. Of course, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Ultimately,

summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

**B. Requirements of Local Rule 56.1**

Northern District of Illinois Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this District. The rule is intended "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (cleaned up). To this end, Local Rule 56.1(a) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). LR 56.1(a)(2). In turn, Local Rule 56.1(d) provides that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." LR 56.1(d)(2).

The non-moving party must then respond to the movant's statement of material facts. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). The response must consist of numbered paragraphs corresponding to the numbered paragraphs in the moving party's Local Rule 56.1 statement, and each response "must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." LR 56.1(e)(1)–(2). "A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." LR 56.1(e)(2). Instead, if the opposing party wishes to assert facts not set forth in the moving party's Local Rule 56.1 statement, it may submit a statement of no more than forty additional material facts, which also must comply with Local Rule 56.1(d). LR 56.1(d)(2), (5).

The Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo*

*v. Frasor*, 662 F.3d 880, 886 (7th Cir. 2011). Where a party fails to comply with Local Rule 56.1's requirements, the Court may exercise its discretion to accept the other party's properly supported statements of fact as undisputed. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014); *Daniels v. Janca*, No. 17 C 906, 2019 WL 2772525, at *2 (N.D.Ill. July 2, 2019) (collecting cases). Consistent with this authority, this Court placed the parties on notice at the pre-summary judgment conference that it would expect them "to comply with Local Rule 56.1," (Dckt. #127), and that the consequence of failing to do so could result in facts in the other side's statement of facts being deemed admitted.

Despite this admonition, the parties' efforts to dispute certain factual statements in each other's statements of fact fall short of the requirements of Local Rule 56.1. First, on ten occasions, Cribbs attempts to dispute certain facts in Willis' statement of additional facts by disputing "inference[s]" that might be drawn from them. (Dckt. ##144 ¶¶1, 5–8, 14, 16, 25, 27, 39). However, Cribbs' denial of implications and assertions that Willis does not make are, by definition, not responsive to the facts that Willis *does* assert. *See Wilson v. Stewart*, 621 F.Supp.3d 900, 913 (N.D.Ill. 2022) ("If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact.") (cleaned up).

Second, on six occasions, the parties attempt to dispute certain facts by attacking the credibility of deponents' testimony. (Dckt. ##136 ¶63; 144 ¶¶18–20, 23–24). This effort to question the accuracy of deponents' testimony by highlighting testimonial discrepancies is merely "smoke" that "does not give rise to a dispute of fact." *DiFranco v. City of Chicago*, 184 F.4th 987, 1000 (7th Cir. 2026). Such disputes "boil[] down to an argument that if the case went to trial, a jury might not believe [Willis'] witnesses. But we have long rejected that line of

argument as a basis for avoiding summary judgment." *DiFranco*, 184 F.4th at 1000. Indeed, to create a "genuine" issue of fact, an opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Finally, on eight occasions, Willis attempts to dispute certain facts in Cribbs' statement of material facts by setting forth new facts in response. (Dckt. #136 ¶¶9, 19, 36, 40–41, 43–44, 47). These facts are only considered to the extent they are separately put forth in plaintiff's statement of additional facts, as a response "may not set forth any new facts." LR 56.1(e)(2).

For these reasons, the Court, in its discretion, deems admitted the properly supported facts in Cribbs' statement of material facts and Willis' statement of additional facts for purposes of these summary judgment proceedings. *See, e.g.*, *Scott v. Town of Cicero*, No. 09 C 6128, 2012 WL 2072972, at *1 n.1 (N.D.Ill. June 6, 2012) (deeming facts admitted where responses, among other things, asserted that statements "accurately reflect[ed]" deposition testimony without introducing contrary evidence and tried to introduce additional facts into the process).[1]

## III. FACTUAL RECORD

The Court draws the factual record from the parties' pleadings; Cribbs' statement of material facts ("DSOF") and its accompanying exhibits, (Dckt. ##132 and 132-2 to 132-12); Willis' response to DSOF ("DSOF Resp.") and its accompanying exhibits, (Dckt. ##136 and 136-1 to 136-2); Willis' statement of additional facts ("PSAF") and its accompanying exhibits, (Dckt. ##137 and 137-1 to 137-4); and Cribbs' response to PSAF ("PSAF Resp."), (Dckt. #144). The following facts are undisputed unless otherwise noted.

[1] Willis also raises "objections" to eleven statements of fact without otherwise admitting or denying those facts. (Dckt. #136 ¶¶11, 14, 20, 25, 28, 30, 33, 34, 51, 54, 71). Where, as in these circumstances, Willis provides no other basis to dispute the facts asserted, those facts are deemed to have been admitted. *See Scott*, 2012 WL 2072972, at *1 n.1.

### A. The Transfer

At 12:49 a.m. on September 15, 2020, Marshawn Fulton and other inmates attacked an inmate who was being moved into their unit in Division 3D of the Residential Treatment Unit (RTU) building, believing that inmate had jumped someone they knew. (DSOF ¶21; PSAF ¶7). Typically, when a detainee is involved in such an altercation or incident, a supervisor sends the Classifications department the incident number, Classifications gives the detainee a new bed assignment, and the detainee is placed in a bullpen—a holding area located on every floor—until they are relocated. (DSOF ¶¶12–13). Classifications reassigned Fulton to Tier 4G after his altercation in 3D. (*Id.* ¶22).

On September 15, 2020, Lieutenant Rodriguez and Sergeant Garcia were assigned to the RTU. (*Id.* ¶8). After the altercation in 3D, Fulton was moved to the floor's bullpen, where he told "the lieutenant, the sarge . . . [and] a couple" correctional officers that he was going to hurt someone if they moved him to Tier 4G. (*Id.* ¶23). Specifically, he testified that he told the lieutenant it was not a good idea to move him to 4G because the incident on 3D was related to an incident on 4G. (*Id.* ¶26). Indeed, Fulton explained that he would be "forc[ed]" to fight if moved to Tier 4G because the detainee he had beaten up was from that unit. (*Id.* ¶27).

After the incident in 3D, Fulton told Rodriguez to place him in segregation rather than in Tier 4G, but Rodriguez refused. (PSAF ¶9). The lieutenant told Fulton that he was getting placed in 4G because he had never had a fight there, and it was the location of the only available bed. (DSOF ¶¶23, 26, 29). The lieutenant also checked to see if Fulton had any conflicts on 4G and found none. (*Id.* ¶28). Rodriguez testified that he has no independent recollection of Fulton, including any recollection of escorting Fulton to Tier 4G on September 15, 2020. (PSAF ¶11). Fulton, on the other hand, testified that the two had a history dating back to 2018 and "didn't get along." (*Id.* ¶12).

Also present when Fulton spoke with the lieutenant in the bullpen were two female correctional officers and one male correctional officer, who Fulton described as a six-foot-three to six-foot-four inch, 245-pound, heavyset black male with a beer belly, a little mustache, and a goatee. (DSOF ¶24). Cribbs was not present at the bullpen. (*Id.* ¶25). Garcia had no memory of Fulton communicating with Garcia or Rodriguez after the incident on Tier 3D, and no memory of whether he saw Fulton that day prior to his placement on Tier 4G. (PSAF ¶¶37–38).

During his deposition, Fulton described himself as having "mental issues" and "an anger problem," and said he was "fucked up mentally" to the extent he would hurt people. (*Id.* ¶4). Indeed, Fulton had been placed in the RTU because, in his words, that was where "all the people that [are] . . . fucked up in the head or mentally disabled or . . . something down the line from that" are housed. (*Id.* ¶3). As of September 8, 2020—a week before Fulton assaulted Willis—Fulton was identified as "pending" for a twenty-one-day move into segregation, also known as a Rehabilitation Unit (RU), based on three prior qualifying incidents on August 9, August 14, and August 31, 2020. (*Id.* ¶¶5, 29).

Cribbs testified that correctional officers (like him) did not have the ability to make housing assignments for inmates, including moving detainees to segregation. (DSOF ¶¶11, 14). In order for a detainee to be placed in segregation, the detainee had to be cleared by both Classifications and Mental Health. (*Id.* ¶10). Fulton testified that segregation is "where everybody go to when they getting caught fighting or a threat to staff." (PSAF ¶10).

At 1:41 a.m., shortly after Fulton assaulted the inmate in 3D, Rodriguez wrote an email to the RTU Superintendent Karen Jones-Hayes stating that Fulton had been involved in a fight. (*Id.* ¶6). Rodriguez issued an AO ("Administrative Officer") Notification report stating that "none of the detainees that were fighting" during the incident in 3D "were transferred to RU housing due

to being filled to capacity" and that report was emailed to Jones-Hayes, among others, at 2:50 a.m. (*Id.* ¶7; Dckt. #139-1 at 1).

### B. Tier 4G

Cribbs was the tier officer assigned to Tier 4G on the fourth floor of the RTU during the events that took place on September 15, 2020. (DSOF ¶16). The fourth floor had six dorms and housed inmates with medical or physical ailments. (*Id.* ¶15). As the "tier officer" for 4G on September 15, Cribbs was "responsible for the safety and security of all inmates assigned" to 4G. (PSAF ¶15).

While Cribbs was normally assigned to work in the transportation unit of the Sheriff's Office, to which he had been assigned since 2012 or 2013, he began working overtime as a tier officer in the RTU beginning in March 2020 due to the COVID-19 pandemic. (DSOF ¶¶5, 7). He worked in the RTU approximately four times a week from 10:00 p.m. to 6:00 a.m., and typically worked on the fourth floor. (*Id.* ¶¶7, 15). Cribbs had a makeshift desk and chair in the hallway outside of Tier 4G, from which he was able to monitor what was going on inside of Tier 4G. (*Id.* ¶20).

As of September 2020, whether an officer had to be inside the RTU living unit depended on whether the living unit was considered a "quarantine or isolation unit" in the midst of the pandemic. (PSAF ¶39). Rodriguez testified that if 4G was not a quarantine or isolation living unit, the tier officer was *required* to be inside the living unit to provide direct supervision. (*Id.*). Prior to September 15, no supervisor had told Cribbs it was permissible to watch Tier 4G from the hallway. (*Id.* ¶16). But Cribbs and Garcia testified that, at some point during the pandemic, the Superintendent of the RTU had told tier officers that they could sit outside the tier window and watch detainees from there. (DSOF ¶19).

Cribbs first learned that Fulton was being transferred to his unit when Fulton was brought there after 3:00 a.m. on September 15, 2020 by Rodriguez and Garcia. (*Id.* ¶31). This was the first time that a detainee was transferred into Cribbs' unit during one of his shifts. (*Id.* ¶35). Cribbs was sitting outside of Tier 4G when Fulton was brought to the tier, and he testified that he did not ask Rodriguez or Garcia why Fulton was being transferred. (*Id.* ¶¶32, 34). Rodriguez removed Fulton's handcuffs while Cribbs unlocked the door to Tier 4G. (*Id.* ¶42).

The parties dispute what Cribbs knew about Fulton's history of violence upon transfer. For his part, Cribbs testified that: (a) he did not recall Fulton objecting to entering 4G or threatening to harm any of the inmates, (*Id.* ¶37); (b) he had no knowledge that Fulton had assaulted correctional officers, had been in multiple fights with other inmates, or had a history of attacking staff or inmates unprovoked, (*Id.* ¶¶40–41); and (c) he could not recall any conversation Fulton had with Rodriguez or Garcia. (*Id.* ¶38).

On the other hand, Garcia testified that when an inmate transferred to a new tier in the middle of the night, it was "common knowledge" that the transfer was taking place because the inmate had just been involved in an incident. (PSAF ¶8). Furthermore, when an inmate was moved in the middle of the night, he was transferred with his ID badge, and the tier officer would take possession of the ID. (*Id.* ¶13). The parties agree that, at the time of Fulton's transfer, Fulton had an orange ID from a prior assault to staff, and that the tier officer would know that Fulton was a staff assault detainee because of his orange ID badge. (*Id.* ¶¶1, 14).

Garcia did not know if Fulton told Cribbs that he would beat people up if placed on Tier 4G, but he testified that if an inmate told *him* that the inmate would hurt another person, Garcia would "look into the computer and see if there's an incident report, and then, yes, I would contact classifications and see if they can assign him somewhere else because of this incident report." (*Id.* ¶¶34–35). Garcia also testified that if he knew that an inmate was mentally ill and

was going to harm someone if placed on a tier, he would facilitate a psych evaluation prior to placing the inmate on the housing unit, consistent with the training provided by the Sheriff's Office. (*Id.* ¶36). Upon receiving Fulton, however, Cribbs did not look in the Sheriff's computer system to see whether he was considered a danger to correctional staff. (*Id.* ¶17).

**C. The Assault**

Fulton testified as follows:

> Then I told Cribbs that I'm not staying over here. That I'm refusing housing. I'm not staying here. He go grab Rodriguez. Rodriguez come and tell me the same shit. He told me that I never had an incident over there. They can't find nowhere. There ain't no open bed space. That I got to stay over there.
>
> So when I walk back in, I told him, Hay, y'all think I'm playing? I walked to Willis and I attacked Willis while he was asleep.

(*Id.* ¶18). Once inside Tier 4G, Fulton testified that he told the correctional officer, "Come to door," and Cribbs "opened the door." (*Id.* ¶19). Fulton testified that he then told Cribbs, "I'm not staying over there. I'm refusing housing. I'm not finna stay over there," and that Cribbs told him, "you got to wait until the first shift." (*Id.* ¶19). Fulton then told Cribbs, "I'm not going to wait until the first shift. If I wait here on the first shift, I'm going to hurt somebody." (Dckt. #132-6 at 77).

The subsequent events, including Fulton's assault on Willis, were captured by multiple security cameras. (DSOF ¶47). After entering the dorm of Tier 4G, Fulton carried in his belongings, turned around to briefly exit and re-enter, and set his belongings down on a bed at the front of the dorm. (*Id.* ¶¶48–49; PSAF ¶20; Dckt. #132–7 at 0:13–0:43). He then walked across the room and entered the bathroom—walking past Willis' bed as he did so—and remained in the bathroom for just over one minute. (DSOF ¶49). After exiting the bathroom, Fulton returned to his bed, where he can be seen moving around for about two minutes before he walked up to the closed tier door. (*Id.* ¶50). Fulton testified that he then put on latex gloves. (PSAF

¶22; Dckt. #132-12 at 4:20–26, 4:59–5:01). While Fulton stood at the door to the tier, he looked through the glass and turned to face the side of the dorm where Willis slept. (DSOF ¶51). Fulton testified that Cribbs was "sitting down, he was on his watch, I think it was his Apple watch." (Dckt. #132-6 at 87:2–3). Cribbs testified that it is common for inmates to come up to the door and look through the glass to see where the officer is. (DSOF ¶52).

The parties dispute what happened when Cribbs approached the door. Cribbs recalled Fulton approaching the door to 4G, but did not recall having a conversation with Fulton or his own "specific location outside the tier" at the time. (PSAF ¶23; DSOF ¶53). Fulton, who recognized Cribbs from a picture at his deposition, testified that he had told Cribbs many times he intended to hurt somebody on Tier 4G and provided him many opportunities to prevent the attack. (PSAF ¶24). In particular, Fulton testified that he "gave them three warnings" that he was going to hurt someone prior to attacking Willis. (*Id.* ¶25).

After standing by the tier door for twenty seconds, Fulton walked along the front of the room to the bed where Willis slept—a journey that took eight seconds—and immediately punched Willis multiple times before walking back to the door. (DSOF ¶¶50, 59). Fulton punched Willis' nose, jaw, and eye, breaking Willis' jaw. (*Id.* ¶62). The assault lasted three seconds. (*Id.* ¶61). Fulton testified he "didn't pick" Willis to attack in particular. (PSAF ¶26). Prior to September 15, 2020, Willis had never interacted with or met Fulton, nor did he know what Fulton looked like. (DSOF ¶70).

Cribbs immediately radio-called for a "10-10," which indicated there was a fight in progress, causing the lights to turn on within seconds and other officers to come assist. (*Id.* ¶64). Cribbs testified that, after the attack, he "watched [Fulton] closely" to ensure he did not attack another inmate. (PSAF ¶27). Shortly after Fulton's assault, Cribbs entered the tier, handcuffed Fulton, and led him out of the dorm. (DSOF ¶65). Multiple correctional officers entered the

dorm within approximately half a minute after the assault occurred. (*Id.* ¶66). In total, Fulton was in Tier 4G for less than five and one-half minutes before Cribbs handcuffed and removed him. (*Id.* ¶68).

On October 12, 2020, Fulton was transferred to segregation for thirty-one total days for incidents that occurred on August 9, August 14, August 31, and September 15, 2020. (PSAF ¶28).

## IV. DISCUSSION

Because Willis was a pretrial detainee at the time he was attacked, his failure to protect claim arises under the Due Process Clause of the Fourteenth Amendment, and is governed by an objective standard. *See Kemp v. Fulton Cnty.*, 27 F.4th 491, 495–97 (7th Cir. 2022). In order to prove a failure to protect claim, a pretrial detainee must show:

> (1) the defendant made an intentional decision regarding the conditions of the plaintiff's confinement; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved, making the consequences of the defendant's inaction obvious; and (4) the defendant, by not taking such measures, caused the plaintiff's injuries.

*Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022). This standard "does not require a pretrial detainee to prove the defendant's subjective awareness of the risk of harm to establish liability." *Davis v. Rook*, 107 F.4th 777, 780 (7th Cir. 2024). Instead, the detainee must prove only that "a reasonable officer under the circumstances would have appreciated the risk of harm to the detainee, and, from there, that the defendant acted in an objectively unreasonable way in addressing that risk." *Davis*, 107 F.4th at 780.

Cribbs asserts that Willis cannot prevail on his Section 1983 failure to protect claim because: (1) Cribbs was not personally involved in any decision-making concerning Willis' conditions of confinement; (2) even if he was, none of his decision-making concerned conditions

that put Willis at substantial risk of serious harm; and (3) no reasonable officer would have appreciated a risk of harm to Willis. (Dckt. #131 at 4–13, 15). In the alternative, Cribbs argues, he is entitled to qualified immunity. (*Id.* at 13–14).

For the following reasons, the Court finds that summary judgment is inappropriate. Reading the record in the light most favorable to Willis, as the Court must, there remain genuine questions of material fact as to Cribbs' knowledge of Willis' intent to harm other inmates, his personal involvement in Willis' conditions of confinement, and how a reasonable correctional officer would have acted in the circumstances. These factual disputes preclude granting Cribbs' motion for summary judgment on the merits and render him unable to establish his entitlement to qualified immunity. Accordingly, the Court denies Cribbs' motion for summary judgment.

**A. There Are Questions of Material Fact About Whether a Reasonable Officer Would Have Appreciated a Substantial Risk of Serious Harm.**

Cribbs argues that he is entitled to summary judgment because no reasonable officer would have appreciated a substantial risk of serious harm to Willis in the circumstances. To prove his claim, Willis will need to show that "a specific defendant was on notice of a serious risk of harm to the detainee." *Thomas*, 39 F.4th at 841 (cleaned up). This analysis "begins with the defendant's knowledge of the factual context and then asks whether a reasonable officer with that knowledge would appreciate the risk of harm and still engage in the same conduct." *Davis*, 107 F.4th at 781. While "the specific risk a reasonable officer would appreciate need not be uniquely associated with the plaintiff or his attacker," it must be "somehow specific to a detainee, and not a mere general risk of violence." *Thomas*, 39 F.4th at 842–43 (cleaned up).

Cribbs asserts that the evidence indisputably shows that: (1) he had no knowledge of Fulton's history of assaults; (2) he had no knowledge of Fulton's prior threats; and (3) and even if he knew of Fulton's prior threats, they were too vague and nonspecific for a reasonable officer

to appreciate a substantial risk of serious harm to the other inmates on the tier. As explained below, the Court disagrees.

### 1. There Are Questions of Material Fact About Cribbs' Knowledge of Fulton's History.

First, there remain genuine questions of material fact about Cribbs' knowledge of Fulton's prior assaults. Although Cribbs testified that he was not aware of Fulton's history of violence, (DSOF ¶¶40–41), it is undisputed that it would have been "common knowledge" that a late-night transfer meant an inmate had just been involved in an incident, (PSAF ¶8), and that Fulton had an orange ID notifying staff that he was *known* to be violent, (*id.* ¶1).

Cribbs contends that he did not himself have "common knowledge" about the implications of a late-night transfer, and that Willis relies on only "improper speculation and conjecture" to argue otherwise. (Dckt. #143 at 4–5). But Willis does not rely on speculation; rather, he relies on Garcia's sworn testimony. Moreover, when drawing all inferences in Willis' favor, as required on a motion for summary judgment, a reasonable juror could conclude that the "common knowledge" Garcia described during his deposition was, in fact, held by Cribbs—an officer who, at the time of Fulton's transfer, had been working late-night shifts as a tier officer in the RTU four times a week for four months, (DSOF ¶7), and had been working in the Sheriff's Office for seven or eight years, (*id.* ¶5)—even if a late-night transfer had never previously taken place during Cribbs' tenure. Indeed, the fact that such transfers were so rare would allow a reasonable jury to infer that Cribbs' suspicion should have been aroused.

Similarly, while Cribbs argues that Willis "provided zero evidence that Officer Cribbs observed the orange ID or that Fulton showed it to him," it is undisputed that an inmate transferred in the middle of the night "would be transferred with his ID badge and the tier officer would take possession of the ID." (PSAF ¶13). Again, this is not "speculation," but is based on

undisputed evidence in the record. For these reasons, when reasonable inferences are drawn in plaintiff's favor, a reasonable juror could conclude that Cribbs witnessed and held Fulton's orange ID upon transfer.

In sum: Fulton's late-night transfer and the orange ID he was transferred with were risks "specific" to him, and they did not pose "a mere general risk of violence." *Thomas*, 39 F.4th at 843; *cf. Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008) (finding no genuine issue of material fact because plaintiff's "main charge against the jail officers is that they should have known what was going on . . . not that they did know") (cleaned up). As such, there is, at a minimum, a genuine issue of material fact as to whether Cribbs was "on notice" of Fulton's prior history of violence.

#### 2. There Are Questions of Material Fact About Cribbs' Knowledge of Fulton's Threats.

There are also genuine questions of material fact about the state of Cribbs' knowledge of Fulton's threats to attack someone on Tier 4G. Fulton, when shown a picture of Cribbs, confirmed that he told Cribbs multiple times that he intended to hurt someone on Tier 4G. (PSAF ¶¶19, 24; Dckt. #132-6 at 128:22–134:1). Cribbs contends, to the contrary, that Fulton only had conversations with Rodriguez and other correctional officers near the bullpen or on the way to Tier 4G. (Dckt. #131 at 9). In support of this contention, Cribbs cites two pieces of evidence that he argues eliminate any question of fact: (1) Fulton's own testimony, particularly Fulton's "extensive and detailed testimony . . . establish[ing] that [any] conversation occurred between him and [Rodriguez], not [Cribbs]," (Dckt. #143 at 8); and (2) security camera footage from within Tier 4G, (Dckt. ##131 at 11; 143 at 9–11). Neither is sufficient to entitle Cribbs to summary judgment.

As a preliminary matter, and as explained above, *see supra* Section II.B., Cribbs' contentions merely "boil[] down to an argument that if the case went to trial, a jury might not believe [Willis'] witnesses," which is not a basis for avoiding summary judgment. *DiFranco*, 184 F.4th at 1000. Indeed, it is well-established that the Court cannot "weigh conflicting evidence" or "make credibility determinations" when ruling on summary judgment, as those are the functions of a jury. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011) (cleaned up).

Moreover, contrary to Cribbs' arguments, neither piece of evidence conclusively establishes that Fulton never warned Cribbs. In his testimony, which must be taken as true, Fulton distinguished between conversations he had with Cribbs and with Rodriguez. (Dckt. #132-6 at 134:2–5) ("Q. Did you ask Officer Cribbs to put you in segregation? A. I asked Lieutenant Rodriguez to put me in segregation. He told me no."). Fulton specifically testified that after he was transferred, he spoke to the correctional officer on his new wing, warning him that he would hurt someone on Tier 4G. (*Id.* at 77:6–20). He testified that he "told Cribbs that I'm . . . refusing housing. I'm not staying here. He go grab Rodriguez. Rodriguez come and tell me the same shit." (*Id.* at 132:14–17). And when asked if he "t[old] Officer Cribbs [he was] not playing," Fulton testified, "Yeah. I told – I told him I'm not playing. Then he thought I was playing, he went to go sit down, and that's when I attacked Willis." (*Id.* at 133:3–7). A reasonable juror could conclude, based on this testimony, that Fulton warned both Cribbs and Rodriguez—in separate conversations—that he would attack someone in Tier 4G, and that, in fact, he warned Cribbs multiple times of the impending attack.

As for the security footage, video evidence "can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023). Here, however, any issue

of fact is magnified, and not resolved, by the security camera footage recording Fulton's brief time in Tier 4G. The parties agree that Fulton can be seen entering Tier 4G with his belongings, setting them on the bed, going to the bathroom, and then returning to his bed. (DSOF ¶¶48–50). They also agree that Fulton then went to the tier door, remained there for twenty seconds, and walked across the dorm before attacking Willis. (*Id.* ¶¶50–51, 58–59). At two different moments in the footage, however, the parties dispute what happened. First, when Fulton first entered Tier 4G, he can be seen briefly exiting, during which time Willis contends Fulton spoke with a correctional officer. (PSAF Resp. ¶20). And second, when Fulton went to the tier door after going to the bathroom, Willis contends that Fulton had a "final communication with correctional staff" before attacking Willis. (*Id.* ¶22).

Cribbs contends that no conversation took place on either occasion, yet he fails to identify "unambiguous video evidence" in support of this contention. *Kailin*, 77 F.4th at 482. With respect to Fulton's entry into Tier 4G, Cribbs argues that "[t]he few seconds that Fulton is facing away from all security cameras is not long enough" for the conversation Fulton claimed to have. (Dckt. #143 at 10). But a reasonable juror might reach a different conclusion, especially given how quickly the entire incident took place in Tier 4G. With respect to Fulton's alleged conversation just before attacking Willis, Cribbs argues that the video footage belies Fulton's testimony that he told Cribbs to open the door, pushed past him, and told him he was refusing housing, because the door never opens. (*Id.*). But, as Willis points out in his DSOF Response, Fulton testified that this conversation took place when he was first brought to Tier 4G, not after he entered the dorm. (DSOF Resp. ¶54).

Regardless, Cribbs' arguments are merely a challenge to Fulton's credibility, which is not a proper basis for summary judgment. *See Omnicare*, 629 F.3d at 704–05. On summary judgment, the Court does not assess witness credibility, and disregards testimony favorable to the

non-movant only when "blatantly contradictory" to the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Where, as here, there is "no audio that could reveal whether [a conversation took place] as [Fulton] alleged," and where "[j]urors could interpret many things from what they see or do not see in those" five and one-half minutes, "[t]his is certainly not the rare case where the video definitively demonstrates what occurred." *Kailin*, 77 F.4th at 482. As such, Cribbs fails to establish that no question of fact remains about whether Fulton warned him that he would harm someone in Tier 4G.

Cribbs further asserts that, even if he had known of Fulton's threats, they "were so vague and nonspecific that a reasonable Officer would not have believed that [Willis] was at risk of serious harm." (Dckt. #131 at 11). In most failure to protect cases, an inmate "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (cleaned up). Complaints that convey "only a generalized, vague, or stale concern about one's safety" typically do not support an inference of actual knowledge, while complaints identifying a "specific, credible, and imminent risk of serious harm and identif[ying] the prospective assailant" typically do. *Gevas*, 798 F.3d at 481. Here, where Willis was asleep and vulnerable when Fulton was transferred and the two did not know each other, (DSOF ¶70), any evidence of actual knowledge stems not from a complaint but from the verbal threats that Fulton testified that he expressed to Cribbs.

In sum, the record reveals genuine issues of fact remain about whether Fulton's threats would have led a reasonable officer to believe Willis was at risk of harm. To reiterate, Fulton testified that he "gave them three warnings," (PSAF ¶25); that the harm he threatened was physical—"I told them there's going to be a fight," (Dckt. #132-6 at 133:11–12); and that he substantiated his threats with reference to the incident in Tier 3D, explaining that the incident

concerned someone who had been in Tier 4G, (*id.* at 130:23–31:22). The Court must take Fulton's testimony as true for purposes of this motion. *See Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021) ("[Plaintiff's] first-hand account of that conversation is competent evidence, even if one alternatively could infer from the lack of mention in the note that the issue was not raised."); *Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020) ("[A] witness's self-interest does not prevent a trier of fact from crediting a statement based on personal knowledge."). Like the plaintiff in *Gevas*, then, Fulton related to Cribbs (and other officers) a "specific, repeated, imminent, and plausible threat" that he would attack someone in Tier 4G. 798 F.3d at 481. The cases that Cribbs cites to the contrary concern threats (or fears) far more general than those at issue here, and are thus inapposite. (*See* Dckt. #131 at 12).[2]

Given Fulton's history of violence and the threats Fulton communicated to Cribbs, a reasonable juror could infer that Cribbs was on notice of a substantial risk of serious harm to the inmates in Tier 4G. Accordingly, there remain genuine questions of material fact about whether a reasonable officer would have appreciated a substantial risk of serious harm in these circumstances.

### B. There Are Questions of Material Fact About Cribbs' Personal Involvement.

Cribbs also argues that he is entitled to summary judgment because "[t]he undisputed evidence in this case shows that [he] did not and could not make *any* decisions regarding the

[2] In *Jones v. Wallace*, for example, an inmate who was later attacked by his cellmate had told officers that he "had a feeling" his cellmate was going to do something to him, and asked for "protective custody," but "he did not provide [defendants] with other information or concerns sufficiently specific to make [them] aware that a substantial risk of serious harm existed." 641 Fed.Appx. 665, 666 (8th Cir. 2016). Similarly, in *Jackson v. IDOC* and cases cited therein, a plaintiff victim "identified a would-be assailant and iterated fear," but he did not "substantiate[ his] fears" by describing a prior history of conflict with his attacker or suggesting that any prior arguments with his attacker had been physical. No. 20 C 5002, 2024 WL 756823, at *4–5 (N.D.Ill. Feb. 23, 2024).

conditions of Plaintiff's confinement on September 15, 2020." (Dckt. #131 at 4) (emphasis in original). The Court disagrees.

Prison officials have a duty to protect pre-trial detainees from violence caused by other inmates. *See Grieveson*, 538 F.3d at 777; *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (discussing the same duty under the Eighth Amendment). It is undisputed that, as the tier officer for 4G on September 15, 2020, Cribbs was "responsible for the safety and security of all inmates assigned" to that unit. (PSAF ¶15). But Cribbs contends that the undisputed facts render it "impossible" for Willis to prove that Cribbs made any decisions about Willis' confinement, as Cribbs was not involved in either the decision to transfer Fulton to Tier 4G, (Dckt. ##131 at 5; 143 at 1–3), or the decision to permit officers to supervise from outside the tier, (Dckt. #131 at 5–6; DSOF ¶19).

Cribbs' arguments are unavailing. Although the parties agree that Cribbs was not involved in the initial decision to transfer Fulton to Tier 4G, (Dckt. ##131 at 5; 140 at 14), there remain genuine issues of material fact about how Cribbs decided to supervise Tier 4G after Fulton was transferred there. For example, it is undisputed that, at the time of Willis' assault, whether an officer had to provide "direct supervision"—"without separation by security walls or other barriers"—depended on whether the living unit was a quarantine or isolation unit, (DSOF ¶17; PSAF ¶39), and that no supervisor had told Cribbs that he was permitted to monitor Tier 4G from the hallway, (PSAF ¶16). To the contrary, Rodriguez testified that the tier officer was required to be inside the living unit to provide direct supervision. (*Id.*).

Moreover, Cribbs made other decisions that implicated Willis' safety and security, particularly in light of the questions of fact that remain about what Cribbs knew of Fulton's history and threats of assault. *See supra* Section IV.A. For example, Cribbs never checked the Sheriff's computer system to see whether Fulton was considered a danger to correctional staff,

(PSAF ¶17), even though: (1) Cribbs' colleague testified that it would have been "common knowledge" that a late-night transfer meant an inmate had just been involved in an incident, (*id.* ¶8); (2) it is undisputed that Fulton had an orange ID, which notified staff that he was known to be violent, (*id.* ¶1); (3) Fulton testified that he *told* Cribbs that he was going to assault someone on Tier 4G, (*id.* ¶19); and (4) Garcia testified that, if an inmate said he would hurt another person, Garcia would check the computer for an incident report and request a reassignment accordingly, (*id.* ¶35). Moreover, Fulton's testimony that he saw Cribbs "on his watch, I think it was his Apple watch," raises a question of fact about how closely Cribbs was monitoring Fulton. (Dckt. #132-6 at 87:2–3). Although Cribbs disputes some of the above evidence and testifies that he was "unaware" of Fulton's history or threats, there remain genuine questions of fact about Cribbs' knowledge of the danger Willis posed to other inmates, and whether Cribbs made decisions concerning Willis and Fulton's confinement that affected Willis' safety given that Cribbs was the officer assigned to monitor Tier 4G while the detainees were asleep.

In sum: although Cribbs is correct that "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability," (Dckt. #143 at 2, *quoting Farmer*, 511 U.S. at 833), because there remain genuine questions of fact about Cribbs' knowledge of the danger posed by Fulton and the decisions Cribbs was able to make on the night of the assault, he is not entitled to summary judgment due to a lack of personal involvement.

### C. There Are Questions of Material Fact About Whether a Reasonable Officer Would Have Acted Differently.

Finally, Cribbs argues that no reasonable officer would have acted differently given the "sudden and unprovoked nature" of Fulton's assault, and given that Cribbs immediately radio-called a 10/10, handcuffed Fulton, and removed him from the tier. (Dckt. ##131 at 12–13; 143 at 7–8). This argument is ultimately a red herring, however, because it fails to consider how a

reasonable officer would have acted if (as evidence in the record supports) he knew that an inmate with a history of assault being transferred in the middle of the night had threatened to hurt someone in Tier 4G if moved to that tier. In light of "the factual information that [Cribbs] received," a reasonable officer might have acted differently before accepting Fulton into his tier or monitoring him from outside the tier. *Davis*, 107 F.4th at 781.

As such, Cribbs is not entitled to summary judgment on the record before the Court.

**D. Cribbs Is Not Entitled to Qualified Immunity.**

Finally, in the alternative, Cribbs argues that he is entitled to qualified immunity, contending that, as a matter of law, Willis cannot prove that a reasonable officer in Cribbs' position would have known his actions violated any constitutional right of Willis' or, knowing as much, acted any differently. (Dckt. #131 at 14).

"Qualified immunity rests on two questions: 'first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation.'" *Pryor v. Corrigan*, 124 F.4th 475, 488 (7th Cir. 2024), *quoting Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). The burden is on the plaintiff to establish both prongs. *Pryor*, 124 F.4th at 488. On a motion for summary judgment, this Court has "three options" where "material facts are disputed." *Villalobos v. Picicco*, 168 F.4th 1057, 1063 (7th Cir. 2026). First, it can grant the motion, "so long as it construes all facts in the plaintiff's favor." *Villalobos*, 168 F.4th at 1064. Second, it can deny the motion and reject the qualified immunity defense as a matter of law. *Id.* And third, "the district court can deny the summary judgment motion when there are disputed facts going to the heart of the immunity defense." *Id.*

Because, for the reasons described above, there are genuine disputes of material fact that go to the core of the qualified immunity defense and the Court must view the evidence in the

light most favorable to Willis, the Court declines to find that Cribbs is entitled to qualified immunity as a matter of law. He will, however, be permitted to re-raise such a defense "after a jury settles the relevant disputes of fact at trial." *Id.*

**CONCLUSION**

For the foregoing reasons, Cribbs' motion for summary judgment, (Dckt. #130), is denied.

**DATE: November 5, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**